Mildred J. HESS

v.

James WARD, Frances E. Regener, Joseph F. Somber, Richard Rittenbaugh, Herbert Chambers, Paul A. Rie, Mrs. Michael L. Strong, Mrs. Shane H. King, Frank Armstead, Arthur M. Bagley.

Civ. A. No. 75–1234.

United States District Court, E. D. Pennsylvania.

July 9, 1980.

Kevin B. Curley, Phoenixville, Pa., Gary R. Block, Legal Aid of Chester County, West Chester, Pa., for plaintiff.

John H. Spangler, West Chester, Pa., for defendants.

## OPINION

LUONGO, District Judge.

Plaintiff, a resident of Chester County eligible for participation in the public housing program of the county, brought this class action suit to challenge the system of priorities through which vacancies in public housing are filled. She seeks injunctive and declaratory relief. On August 3, 1977, I certified a class including all residents of Chester County who reside outside of one of those municipalities in the county which has public housing, who have applied or will in the future apply for public housing, and who have been or will be denied admission to public housing solely because they do not reside within a municipality with public housing. Defendants are various officials of the Housing Authority of the County of Chester (HACC), and the mayors of several municipalities in Chester County.

In filling vacancies in public housing, HAAC employs a priority system granting preference to applicants who have resided not less than six months in a municipality in which there is a public housing project, in the following order of priority: elderly families; displaced families; families of servicemen and veterans; families in unsafe, overcrowded, or unsanitary dwellings; and families who were bona fide residents of the municipality up to a time not more than six months before their application for housing, but were compelled to move for lack of affordable housing. After all eligible residents of the municipalities where the housing is located are placed in accordance with the priority system, consideration is given to applicants like Hess and members of the plaintiff class who live in Chester County, but have never resided in one of the municipalities with public housing, or have resided therein for less than six months. Hess made application for housing on February 3, 1975, and has not yet been placed. She contends that the preference for those who have resided for longer than six months in the municipality in which the housing is located violates applicable federal regulations and denies equal protection of the laws. She attacks both aspects: (1) the requirement that the applicant reside within the municipality, and (2) the requirement that the residency be of six months or longer duration.

In lieu of a trial, the parties submitted the matter on stipulated facts and filed briefs in support of their respective positions. The stipulated facts (with selected exhibits) are:

## STIPULATION OF FACTS

1. The Housing Authority of the County of Chester (hereinafter HACC) was established pursuant to the United States Housing Act of 1937, 84 Stat. 1779, 42 U.S.C. Section 1401 et seq., as amended by the Housing and Community Development Act of 1974, P.L. No. 93–383, 42 U.S.C. Section 1437 et seq. and regulations promulgated thereunder and pursuant to the Housing Authorities Law, Act of May 28, 1937 P.L. 955, 35 P.S. § 1541 et seq. by a resolution of the Board of County Commissioners of the County of Chester, Pennsylvania dated June 5, 1963. A copy of this resolution, marked Exhibit "A" is attached and incorporated into these stipulated facts.

2. By the above–mentioned resolution the following persons were appointed as members of the Board of HACC: Peter J. Short, Jr., Frank W. Armstead, Paul Rie, Michael Strong, Shane H. King. Appointed as Executive Director of HACC was James Ward.

The current members of the Board of HACC are Arthur M. Bagley, Chairman, Paul A. Rie, Ann L. Strong, Daniel E. Grow, Jr., and David J. Williams. The current acting Executive Director of HACC is Vernon Cothran, who administers the daily operations of HACC.

3. HACC maintains traditional public housing in the following Chester County municipalities:

| | |
|---|---|
| West Chester: | 150 units |
| Coatesville: | 200 units |
| South Coatesville: | 30 units |
| Phoenixville: | 75 units |

4. HACC has established eligibility standards for admission and continued occupancy which include family size, income and asset requirements. These standards are set forth in the Admissions and Occupancy Policies of HACC.

5. Exhibit "B" attached and incorporated herein sets forth the system of priority levels of HACC's Admissions and Occupancy Policy.

6. Pursuant to the Admissions and Occupancy Policy HACC gives preference for admission to applicants who have resided not less than six months in the municipality in which a low rent public housing project is in operation and with which HACC has a cooperation agreement.

7. HACC has a final priority level, which has not received a numerical designation, into which HACC places applicants who have never resided in one of the above–mentioned municipalities; or who at the time of their application, have resided

in one of the four municipalities for less than six months.

8. For the purposes of this case, this final priority level (as described in paragraph 7) shall be known as "Priority Six".

9. If and when an applicant, who at the time of his application was a resident of one of the above–mentioned municipalities for less than six months, meets the six month residency criteria HACC removes the application from "Priority Six" and places the application within one of five other priority levels.

10. When HACC receives an application from a person who does not reside in one of the above–mentioned municipalities HACC assigns that applicant to the housing project waiting list in the municipality geographically closest to the residence of the applicant.

11. The procedure, as described in paragraph 10 is an administrative device formulated by HACC to disseminate the applications to the housing project it considers appropriate.

12. If and when all eligible municipal resident applicants for the respective low–income housing project have received appropriate consideration, HACC will then select tenants for any remaining vacant units from among eligible applicants who have never resided in the respective municipality or who have resided within the municipality for less than six months.

13. Plaintiff Mildred J. Hess is an adult individual who, with her five children, resides at 6 Bradley Avenue in Valley Township, Chester County, Pennsylvania.

14. Plaintiff Hess made application to HACC for admission into one of its units of public housing on February 3, 1975. Since Plaintiff Hess did not reside within one of the four municipalities HACC placed her application in the "Priority Six" category and assigned her application to the Coatesville housing project waiting list since that project was geographically closest to the residence of Plaintiff Hess.

15. Since its inception, HACC has placed six tenants who were considered to be in the "Priority Six" category in its low income housing projects.

16. Four of the six tenants, as described in paragraph 15 were residents of West Chester, Kennett Square and Downingtown and were placed in the Coatesville low income housing project shortly after HACC opened the Coatesville units for tenants in 1974; after HACC had exhausted the eligible Coatesville municipal resident applicants for four bedroom units.

17. The remaining two tenants were residents of Schuylkill Township and were placed in the Phoenixville low income housing project shortly after HACC opened the Phoenixville units for tenants in 1971; after HACC had exhausted the eligible Phoenixville municipal resident applicants.

18. With the exception of the HACC acceptance of the six "Priority Six" tenants, as set forth in paragraphs 15, 16, and 17 all of the tenants of each low income housing project operated by HACC have been applicants who have been residents of the municipality in which the project is located for six months or more.

19. All applications received by HACC which cannot immediately be placed with a unit of low income housing project operated by HACC are placed on a waiting list within each respective municipal project.

20. Exhibit "C",* a copy of which is attached and incorporated herein, of Defendants Answers to Plaintiffs Interrogatories is a breakdown by municipality and by housing unit size of the number of applicants on waiting lists for each priority.

21. Exhibit "C" also contains the waiting list of the applicants who do not presently reside in a municipality containing a HACC low income housing project.

22. Shortly after the creation of HACC various members of HACC, including Paul

---

* Exhibits "C" through "H" inclusive, attached to the original of the stipulation submitted by the parties, are not attached to this opinion.

Rie, Ann Strong, Martha McAvoy King and James Ward, were told by persons in the Department of Housing and Urban Development (HUD) that it was HUD's experience that local municipalities would permit the construction of traditional public housing only if municipal residents were given a preference in admission over non–municipal residents.

23. HACC adopted the priority levels, including Priority Six, because it was apparent to HACC that the municipalities would not accept traditional public housing without the preference being given to their residents.

24. HACC has entered into a Cooperation Agreement with each of the four previously mentioned municipalities. Copies of these Cooperation Agreements, marked Exhibit "D" are attached and incorporated into these stipulated facts.

25. HACC has not made any effort to require any of the previously mentioned four municipalities to comply with the municipalities' responsibilities as set forth in Subsection 4 of the Cooperation Agreement. The Redevelopment Authority of Chester County has conducted a condemnation and rehabilitation program in Chester County. Data from the Redevelopment Authority indicates that since 1975 the following number of dwelling units have been eliminated by either rehabilitation or condemnation:

| | |
|---|---|
| Phoenixville | 60 Dwelling units |
| Coatesville | 43 Dwelling units |
| South Coatesville | 45 Dwelling units |
| West Chester | 65 Dwelling units |

26. By letter dated April 26, 1968 Housing Assistance Office, Region II of HUD advised HACC that Projects PA46–1 (South Coatesville) and 46–2 (West Chester) were to be considered a separate location because of the distance between them. A copy of this letter, marked Exhibit "E" is attached and incorporated into these stipulated facts.

27. The above letter further directed HACC to forward to HAO a certified copy of the Board Resolution of HACC adopting these locations.

28. At the May 8, 1968 meeting of the members of the Board of HACC, James Ward, the Executive Director, presented the April 26, 1968 letter from HAO to HACC to the members of the Board of HACC.

29. As a result of the above–mentioned HAO letter, Mrs. Strong moved that the Authority (HACC) resolve, for purposes of carrying out its program regarding tenant selection and for the implementation of all its civil rights and non–discrimination programs, that each of the two projects (South Coatesville and West Chester) be treated as independent and separate locations by reason of the physical distance between them.

30. The members of the Board of HACC passed and adopted the above mentioned motions of Mrs. Strong at the May 8, 1968 meeting of the Board.

31. All admissions policies adopted by HACC, including the current admissions policy adopted February, 1977 were approved by the Department of Housing and Urban Development (HUD). All admissions policies adopted by HACC have granted priority to applicants residing in a municipality served by a HACC project for more than six months.

32. No person is totally excluded from living in public housing because of HACC priority system. In the past, families who were not residents of municipalities served by HACC were, in fact admitted to public housing when vacancies occurred as more specifically set forth in paragraphs 15 through 18 in the Stipulation of Facts.

33. Municipal governments have consistently insisted that residents of the municipality be given priority before the municipal government would allow the construction of low–cost public housing. It has been the consistent policy of HACC to seek the approval of local governments before constructing publicly financed, low–cost housing. Members of local governments currently in office in Chester County would testify that they would not approve of the construction of public housing unless residents were given priority in access to that housing.

34. HACC is exempt from local taxation. All cooperating agreements made between HACC and the municipalities provide for payments in lieu of taxes (PILOT). Payments in lieu of taxes are less than the amount of taxes which would be paid were HACC taxable. HACC, nonetheless, receives the same municipal services as a taxable entity.

35. HACC provides county wide housing assistance to low income families through the Section 8 program. This program provides rent subsidies to private landlords who accept low income tenants. These subsidies are credited against the rent which the low income tenant would normally have to pay. Subsidies are granted without regard to the residence of the tenant or the location of the premises to be rented. Exhibit "F", attached hereto, is a status report listing the number of rent subsidy contracts offered to low income families, the status of those contracts as of June 1, 1978, the location of the leased premises, and where the tenant moved from in order to occupy the leased premises. The first leases under this program were signed in February, 1977. Exhibit "G" attached hereto is a status report as of March 1, 1979. The number of applicants for Section 8 subsidies are listed by location of the applicant. The disposition of each application is noted.

36. The Department of Housing and Urban Development (HUD provides financial assistance for the operation of HACC pursuant to an Annual Contributions Contract between HUD and HACC. Copies of these contracts, marked Exhibit "H", are attached and incorporated into these stipulated facts.

EXHIBIT A

COMMONWEALTH OF
PENNSYLVANIA

DEPARTMENT OF STATE

OFFICE OF THE SECRETARY OF THE
COMMONWEALTH

Harrisburg,   October 24, 1963

Pennsylvania, ss:

I DO HEREBY CERTIFY, That the foregoing and annexed is a full, true and correct photocopy of a Resolution of the "HOUSING AUTHORITY OF THE COUNTY OF CHESTER", approved June 11, 1963, setting forth a Need for a Housing Authority, filed in accordance to the Act approved May 28, 1937, P.L. 955, as the same appears of record in this Office.

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the seal of the Secretary's Office to be affixed, the day and year above written.

Secretary of the Commonwealth

CERTIFICATE RECITING THE ADOPTION OF RESOLUTIONS BY THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF CHESTER, PENNSYLVANIA, FINDING AND DECLARING THE NEED FOR A HOUSING AUTHORITY TO FUNCTION WITHIN THE COUNTY OF CHESTER, PENNSYLVANIA, AND APPOINTING ITS MEMBERS.

The Board of County Commissioners of the County of Chester, Pennsylvania, held a duly authorized regular meeting on the 5th day of June, 1963, at which meeting a quorum was present and C. Gilbert Hazlett, by virtue of his office as Chairman, presided; and the following are true and correct copies of resolutions which were passed and adopted at said meeting.

BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF CHESTER, PENNSYLVANIA, AS FOLLOWS:

*Section 1.* The Board of County Commissioners of the County of Chester, Pennsylvania, hereby determines, finds and declares, pursuant to the "Housing Authorities Law" of the Commonwealth of Pennsylvania, that:

1. Unsanitary and unsafe inhabited dwelling accommodations exist in the County of Chester, Pennsylvania; and

2. There is a shortage of safe and sanitary dwelling accommodations in the County of Chester, Pennsylvania; available to families of low income at rentals they can afford, resulting in the conditions, prejudicial to the welfare of the people of the Commonwealth, described in Section two (b) and (C) of the Housing Authorities Law; and

3. There is need for a housing authority within the territorial limits of the County of Chester, Pennsylvania.

*Section 2.* The corporate name of said authority shall be "Housing Authority of the County of Chester."

*Section 3.* The Chief Clerk of the Board of County Commissioners be and he hereby is authorized and directed to issue a certificate reciting the adoption of the foregoing resolution; and to file such certificate with the Department of State in a duplicate thereof with the State Planning Board.

*Section 4.* This resolution shall be effective immediately.

BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF CHESTER, PENNSYLVANIA, AS FOLLOWS:

The following named persons, residents of the County of Chester, and none of whom are paid public officers, be and the same hereby are appointed as members of the Housing Authority of the County of Chester to serve from June 5, 1963 for the number of years set opposite their names.

| | |
|---|---|
| Mr. Peter J. Short Jr. | 1 year |
| Mr. Frank W. Armstead | 2 years |
| Mr. Paul Rie | 3 years |
| Mrs. Michael Strong | 4 years |
| Mrs. Shane H. King | 5 years |

NOW, THEREFORE, pursuant to the provisions of Section 4(b) of the "Housing Authorities Law", and by virtue of my office as Chief Clerk, I hereby make this Certificate.

IN WITNESS WHEREOF, I have hereunto signed my name as Chief Clerk of the Board of County Commissioners of the County of Chester, Pennsylvania, and caused the official corporate seal of said County of Chester to be attached hereto this 5th day of June, 1963.

/s/ Milton H. Brock
Chief Clerk

[SEAL]

Filed in the Department of State on the 11th day of June A.D. 1963.

*George Bloom*
Secretary of the Commonwealth

CERTIFICATE

I, Milton H. Brock, the duly qualified and acting Chief Clerk of the Board of County Commissioners of the County of Chester, Pennsylvania, do hereby certify that the rescheduled regular meeting of said Board of County Commissioners held on the 5th day of June 1963, at which meeting the Resolution declaring the need for a Housing Authority in the County of Chester was adopted, was held pursuant to public notice, of the date, time, and place of said meeting, given as prescribed by Act of June 21, 1957, P.L. 392 Sec. 3 as amended by Act of September 28, 1959, P.L. 987 No. 403 Sec. 1. (A)(1) ... by posting a copy of the notice prominently at the Chester County Court House .... and (B) ... at least twenty–four (24) hours prior to the time of the rescheduled meeting.

IN TESTIMONY WHEREOF, I have hereunto set my hand and the seal of said County this 2nd day of December, 1963.

/s/ Milton H. Brock
Chief Clerk

(SEAL)

The following resolution was introduced by   Mr. Armstead   , read in full and considered:

RESOLUTION AUTHORIZING EXECUTION OF COOPERATION AGREEMENT

VIII

WHEREAS, the Housing Authority of the County of Chester (herein called the "Local Authority") proposes to develop a certain low–rent housing project or projects

in the Borough of South Coatesville with the financial assistance of the Public Housing Administration (herein called the "PHA"); and

WHEREAS, it is necessary that the Local Authority enter into a Cooperation Agreement with the Borough of South Coatesville in connection with the said housing,

NOW, THEREFORE, BE IT RESOLVED BY THE MEMBERS OF THE LOCAL AUTHORITY as follows:

1. The Local Authority shall enter into a Cooperation Agreement with the Borough of South Coatesville with respect to approximately 30 units of low-rent housing to be developed in the Borough of South Coatesville.

2. The Chairman or Vice-Chairman is hereby authorized and directed to execute said Cooperation Agreement in the name and on behalf of the Local Authority in as many counterparts as may be necessary and the Secretary is hereby authorized and directed to affix or impress the official seal of the Local Authority thereon and to attest the same. The proper officers are authorized and directed to forward such executed counterparts of said Cooperation Agreement to the PHA, together with such other documents evidencing the approval and authorization of the execution of said Cooperation Agreement as may be required by the PHA. Said Cooperation Agreement shall be in substantially the attached form.

3. This Resolution shall take effect immediately.

### COOPERATION AGREEMENT

This Agreement entered into this _____ day of _____, 196__, by and between Housing Authority of the County of Chester (herein called the "Local Authority") and Borough of South Coatesville (herein called the "Local Government").

### WITNESSETH:

In consideration of the mutual covenants hereinafter set forth, the parties hereto do agree as follows:

1. Whenever used in this Agreement:
(a) The term "Project" shall mean any low-rent housing hereafter developed as an entity by the Local Authority with financial assistance of the Public Housing Administration (herein called the "PHA"); excluding, however, any low-rent housing project covered by any contract for loans and annual contributions entered into between the Local Authority and the PHA, or its predecessor agencies, prior to the date of this Agreement.
(b) The term "Taxing Body" shall mean the State or any political subdivision or taxing unit thereof in which a Project is situated and which would have authority to assess or levy real or personal property taxes or to certify such taxes to a taxing body or public officer to be levied for its use and benefit with respect to a Project if it were not exempt from taxation.
(c) The term "Shelter Rent" shall mean the total of all charges to all tenants of a Project for dwelling rents and non-dwelling rents (excluding all other income of such Project), less the cost to the Local Authority of all dwelling and non-dwelling utilities.
(d) The term "Slum" shall mean any area where dwellings predominate which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitation facilities, or any combination of these factors, are detrimental to safety, health or morals.

2. The Local Authority shall endeavor (a) to secure a contract or contracts with the PHA for loans and annual contributions covering one or more Projects comprising approximately 30 units of low-rent housing and (b) to develop and administer such Project or Projects, each of which shall be located within the corporate limits of the Local Government. The obligations of the parties hereto shall apply to each such Project.

3. (a) Under the constitution and statutes of the Commonwealth of Pennsylvania, all Projects are exempt from all real and personal property taxes and special assessments levied or imposed by any Taxing Body. With respect to any Project so long

as either (i) such Project is owned by a public body or governmental agency and is used for low–rent housing purposes, or (ii) any contract between the Local Authority and the PHA for loans or annual contributions, or both, in connection with such Project remains in force and effect, or (iii) any bonds issued in connection with such Project, or any monies due to the PHA in connection with such Project remain unpaid, whichever period is the longest, the Local Government agrees that it will not levy or impose any real or personal property taxes or special assessments upon such Project or upon the Local Authority with respect thereto. During such period, the Local Authority shall make annual payments (herein called "Payments in Lieu of Taxes") in lieu of such taxes and special assessments and in payment for the public services and facilities furnished from time to time without other cost or charge for or with respect to such Project.

(b) Each such annual Payment in Lieu of Taxes shall be made after the end of the fiscal year established for such Project, and shall be in an amount equal to either (i) ten percent (10%) of the Shelter Rent charged by the Local Authority in respect to such Project during such fiscal year or (ii) the amount permitted to be paid by applicable state law in effect on the date such payment is made, whichever amount is the lower.

(c) The Local Government shall distribute the Payments in Lieu of Taxes among the Taxing Bodies in the proportion which the real property taxes which would have been paid to each Taxing Body for such year if the Project were not exempt from taxation bears to the total real property taxes which would have been paid to all of the Taxing Bodies for such year if the Project were not exempt from taxation; *Provided, however,* That no payment for any year shall be made to any Taxing Body in excess of the amount of the real property taxes which would have been paid to such Taxing Body for such year if the Project were not exempt from taxation.

(d) Upon failure of the Local Authority to make any Payment in Lieu of Taxes, no lien against any Project or assets of the Local Authority shall attach, nor shall any interest or penalties accrue or attach on account thereof.

4. The Local Government agrees that, subsequent to the date of initiation (as defined in the United States Housing Act of 1937, as amended) of each Project and within five years after the completion thereof, or such further period as may be approved by the PHA, there will be elimination (as approved by the PHA) by demolition, condemnation, effective closing, or compulsory repair of improvement, of unsafe or insanitary dwelling units situated in the locality or metropolitan area of the Local Government substantially equal in number to the number of newly constructed dwelling units provided by such Project; *Provided,* that, where more than one family is living in an unsafe or insanitary dwelling unit, the elimination of such unit shall count as the elimination of units equal to the number of families accommodated therein; and *Provided, further,* that this paragraph 4 shall not apply in the case of (i) any Project developed on the site of a Slum cleared subsequent to July 15, 1949 and that the dwelling units eliminated by the clearance of the site of such Project shall not be counted as elimination for any other Project or any other low–rent housing Project, or (ii) any Project located in a rural non–farm area.

5. During the period commencing with the date of the acquisition of any part of the site or sites of any Project and continuing so long as either (i) such Project is owned by a public body or governmental agency and is used for low–rent housing purposes, or (ii) any contract between the Local Authority and the PHA for loans or annual contributions, or both, in connection with such Project remains in force and effect, or (iii) any bonds issued in connection with such Project or any monies due to the PHA in connection with such Project remain unpaid, whichever period is the longest, the Local Government without cost or charge to the Local Authority or the ten-

ants of such Project (other than the Payments in Lieu of Taxes) shall:

(a) Furnish or cause to be furnished to the Local Authority and the tenants of such Project public services and facilities of the same character and to the same extent as are furnished from time to time without costs or charge to other dwellings and inhabitants in the Local Government.

(b) Vacate such streets, roads and alleys within the area of such Project as may be necessary in the development thereof, and convey without charge to the Local Authority such interest as the Local Government may have in such vacated areas; and, insofar as it is lawfully able to do so without costs or expense to the Local Authority or to the Local Government cause to be removed from such vacated areas, insofar as it may be necessary, all public or private utility lines and equipment;

(c) Insofar as the Local Government may lawfully do so, (i) grant such deviations from the building code of the Local Government as are reasonable and necessary to promote economy and efficiency in the development and administration of such Project, and at the same time safeguard health and safety, and (ii) make such changes in any zoning of the site and surrounding territory of such Project as are reasonable and necessary for the development and protection of such Project and the surrounding territory;

(d) Accept grants of easements necessary for the development of such Project; and

(e) Cooperate with the Local Authority by such other lawful action or ways as the Local Government and the Local Authority may find necessary in connection with the development and administration of such Project.

6. In respect to any Project the Local Government further agrees that within a reasonable time after receipt of a written request therefor from the Local Authority:

(a) It will accept the dedication of all interior streets, roads, alleys, and adjacent sidewalks within the area of such Project, together with all storm and sanitary sewer mains in such dedicated areas, after the Local Authority, at its own expense, has completed the grading, improvement, paving, and installation thereof in accordance with specifications acceptable to the Local Government;

(b) It will accept necessary dedications of land for, and will grade, improve, pave, and provide sidewalks for, all streets bounding such Project or necessary to provide adequate access thereto (in consideration whereof the Local Authority shall pay to the Local Government such amount as would be assessed against the Project site for such work if such site were privately owned); and

(c) It will provide, or cause to be provided,* water mains, and storm and sanitary sewer mains, leading to such Project and serving the bounding streets thereof (in consideration where of the Local Authority shall pay to the Local Government such amount as would be assessed against the Project site for such work if such site were privately owned).

7. *If by reason of the Local Government's failure or refusal to furnish or cause to be furnished any public services or facilities which it has agreed hereunder to furnish or cause to be furnished to the Local Authority or to the tenants of any Project, the Local Authority incurs any expense to obtain such services or facilities, then the Local Authority may deduct the amount of such expense from any Payments in Lieu of Taxes due or to become due to the Local Government in respect to any Project or any other low–rent housing Projects owned or operated by the Local Authority.*

---

* Insofar as it can legally do so, as limited by the fact that all water mains and water service within the borough are owned and operated by the City of Coatesville.

8. No Cooperation Agreement heretofore entered into between the Local Government and the Local Authority shall be construed to apply to any Project covered by this Agreement.

9. So long as any contract between the Local Authority and the PHA for loans (including preliminary loans) or annual contributions, or both, in connection with any Project shall remain in force and effect, or so long as any bonds issued in connection with any Project or any monies due to the PHA in connection with such Project remain unpaid, this Agreement shall be abrogated, changed or modified without the consent of the PHA. The privileges and obligations of the Local Government hereunder shall remain in full force and effect with respect to each Project so long as the beneficial title to such Project is held by the Local Authority or any other public body or governmental agency, including the PHA, authorized by law to engage in the development or administration of low–rent housing Projects. If at any time the beneficial title to, or possession of, any Project is held by such other public body or governmental agency, including the PHA, the provisions hereof shall inure to the benefit of and may be enforced by, such other public body or governmental agency including the PHA.

IN WITNESS WHEREOF, the Local Government and the Local Authority have respectively signed this agreement and caused their seals to be affixed and attested as of the day and year first above written.

(S E A L)

Attest:

(Title)

(S E A L)

Attest:

Borough of South Coatesville
      (Corporate Name of Municipality)

By_____
    (Title)

Borough Secretary

Housing Authority of the County of Chester
      (Corporate Name of Authority)

By_____
      Chairman

---

The following resolution was introduced by ___Mr. Rie___, read in full and considered:

## RESOLUTION AUTHORIZING EXECUTION OF COOPERATION AGREEMENT

### IX

WHEREAS, the Housing Authority of the County of Chester (herein called the "Local Authority") proposes to develop a certain low–rent housing project or projects in the Borough of West Chester with the financial assistance of the Public Housing Administration (herein called the "PHA"); and

WHEREAS, it is necessary that the Local Authority enter into a Cooperation Agreement with the Borough of West Chester in connection with the said housing,

NOW, THEREFORE, BE IT RESOLVED BY THE MEMBERS OF THE LOCAL AUTHORITY as follows:

1. The Local Authority shall enter into a Cooperation Agreement with the Borough of West Chester with respect to approxi-

mately 50 units of low–rent housing to be developed in the Borough of West Chester.

2. The Chairman or Vice–Chairman is hereby authorized and directed to execute said Cooperation Agreement in the name and on behalf of the Local Authority in as many counterparts as may be necessary and the Secretary is hereby authorized and directed to affix or impress the official seal of the Local Authority thereon and to attest the same. The proper officers are authorized and directed to forward such executed counterparts of said Cooperation Agreement to the PHA, together with such other documents evidencing the approval and authorization of the execution of said Cooperation Agreement as may be required by the PHA. Said Cooperation Agreement shall be in substantially the attached form.

3. This Resolution shall take effect immediately.

purpose of awaiting application by a family falling within the appropriate range.

A. *PRIORITIES:*

THE AUTHORITY WILL GIVE PREFERENCE IN SELECTION OF TENANTS TO LOCAL PROJECTS TO APPLICANTS WHO HAVE RESIDED NOT LESS THAN SIX MONTHS IN THE MUNICIPALITY IN WHICH A LOW–RENT PUBLIC HOUSING PROJECT IS IN OPERATION AND WITH WHICH THE AUTHORITY HAS A COOPERATION AGREEMENT.

First: ELDERLY FAMILIES

(a) ELDERLY FAMILIES WITH FAMILIES OF VETERANS OR SERVICEMEN HAVING PREFERENCE OVER OTHER FAMILIES IN THIS CATEGORY.

(b) ELDERLY FAMILIES WITH DISPLACED ELDERLY FAMILIES HAVING PREFERENCE OVER NON–DISPLACED ELDERLY FAMILIES.

Second: Other displaced families, with families of veteran's and servicemen having preference over other families in this category.

Third: Families of veterans and servicemen who have not been displaced.

Fourth: FAMILIES LIVING IN UNSAFE, UNSANITARY OR OVERCROWDED DWELLINGS, OR SHARING ACCOMMODATIONS WITH OTHER FAMILIES, OR PAYING MORE THAN 25% OF THE TOTAL FAMILY INCOME FOR RENT, OR ACTUALLY WITHOUT HOUSING OR ABOUT TO BE WITHOUT HOUSING, THROUGH NO FAULT OF THE APPLICANT.

Fifth: OTHER FAMILIES, INCLUDING FAMILIES WHO WERE BONA FIDE RESIDENTS OF THE RESPECTIVE MUNICIPALITY UP TO A TIME NOT MORE THAN SIX MONTHS PRECEDING THE DATE OF THEIR ORIGINAL APPLICATION FOR ADMISSION, BUT WERE COMPELLED TO MOVE ELSEWHERE IN THE INTERIM PERIOD BECAUSE OF THE NON–AVAILABILITY OF STANDARD HOUSING WITHIN THE MUNICIPALITY, AT RENTAL RATES WITHIN 25% OF THEIR TOTAL FAMILY INCOME.

THE SAME ORDER OF PREFERENCE WILL BE USED TO SELECT TENANTS FROM AMONG ELIGIBLE APPLICANTS WHO ARE RESIDENTS OF CHESTER COUNTY BUT WHO HAVE NEVER RESIDED IN THE RESPECTIVE MUNICIPALITY OR HAVE RESIDED THERE LESS THAN SIX MONTHS, IF AND WHEN ALL ELIGIBLE RESIDENT APPLICANTS HAVE RECEIVED APPROPRIATE CONSIDERATION.

WITHIN EACH OF THE ABOVE CATEGORIES, THE URGENCY OF APPLICANTS' NEED FOR HOUSING WILL BE DETERMINED BY THE AUTHORITY AFTER APPROPRIATE INVESTIGATION.

B. *Tenant Selection Criteria*

The following criteria will be used in selecting families for occupancy in HOUSING AUTHORITY'S PROJECTS beyond the basic conditions governing eligibility:

1. Applicant's past performance in meeting financial obligations, especially rent;

2. A record of disturbance of neighbors, destruction of property, or living or housekeeping habits at prior residences which may adversely affect the health, safety or welfare of other tenants;

## DISCUSSION

### (a) Location

■ Hess first contends that the preference for residents of the municipalities in which public housing is located violates regulations promulgated by the Department of Housing and Urban Development (HUD). HACC is party to an Annual Contributions Contract with HUD, under which HACC agreed to comply with all provisions of the United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq.* Under the Act, HUD has broad rule–making authority, and rules established by HUD are binding upon participating housing authorities. *See Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); *Brown v. Housing Authority of the City of Milwaukee,* 471 F.2d 63 (7th Cir. 1972); 24 C.F.R. § 841.102(b).

Title 24 C.F.R. § 841.115(c)(5) provides that:

Requirements or preferences for those living in the jurisdiction of the PHA [Public Housing Authority] at the time of application are permissible subject to the following: No requirement or preference may be based upon the identity or location of the housing which is occupied by the applicant nor upon the length of time the applicant has resided in the jurisdiction. . . .

Hess contends that HACC's preference for residents of the municipality in which a housing opening is available is a preference based upon the "identity or location" of the housing, and therefore prohibited by § 841.-115, and I agree that it is. Any preference based upon the "identity or location" of the housing is prohibited by § 841.115. Here, the key to HACC's priority system is the location of the housing; any applicant from outside a municipality in which public housing openings are located is at a marked disadvantage in getting placed. Although certain kinds of preferences are permissible, such as HACC's preference for the elderly or for veterans, the regulation in question quite clearly forbids a housing authority from taking into account where the housing is located in allocating vacancies.

■ Defendants contend that HACC's preference for residents of certain municipalities is explicitly authorized by another set of HUD regulations. HUD publishes a Public Housing Occupancy Handbook to assist local housing authorities in complying with HUD regulations and contributions contracts. Local authorities are required to follow the policies set forth in the handbook. *Staten v. Housing Authority of the City of Pittsburgh,* 469 F.Supp. 1013, 1015 (W.D.Pa.1979). Section 2–19 of the Handbook states: "As provided in 24 C.F.R. Section 841.115(c)(5), a PHA may limit access to the program to those families living in the jurisdiction of the PHA at the time of the application or may establish a preference on a similar basis." Defendants argue that "jurisdiction" in this case refers to the individual municipalities in which the housing is located, and that a priority system favoring residents of such municipalities is therefore permissible.

■ Defendants' interpretation of what is meant by the term "jurisdiction" under the regulation is unpersuasive. The regulation refers to the jurisdiction of the public housing authority, in this case HACC, whose jurisdiction is clearly county–wide. None of the individual municipalities within the county has established a housing authority of its own, and the regulation on its face makes reference only to housing authorities, not to the various political subdivisions which may be served by a housing authority. HACC was formed in accordance with the provisions of the Pennsylvania Housing Authorities Law, 35 Pa.Stat. Ann. § 1541 *et seq.* (1977). Section 1544(b) of the Act provides that a county may

create a housing authority to function "within the territorial limits" of the county, and, in forming HACC, the Chester County Board of Commissioners declared their intention that it should function county–wide. As the public housing authority of Chester County, HACC is permitted by the Public Housing Occupancy Handbook to exclude applicants for housing from outside of the county. It does not follow that HACC may give certain applicants from within the county priority on the basis of where within the county they live. Rather, it is clear from § 841.115 that a housing authority may not treat applicants who live within its jurisdiction differently solely on the basis of where within the jurisdiction they reside.

Defendants further contend that their system of preferences must be permissible under the regulations because HUD officials have implicitly approved of the system in two ways: first, by urging HACC to adopt a policy of granting preference to applicants from municipalities in which public housing openings are located so as to ensure the cooperation of local officials; and second, by not objecting to HACC's preference system when it was reviewed by HUD officials during the course of HUD's oversight of HACC under its Annual Contributions Contract.

■ Administrative interpretation of regulations by an agency charged with their enforcement is controlling unless it is plainly inconsistent with the regulations themselves. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *McCullough v. Redevelopment Authority of the City of Wilkes–Barre*, 522 F.2d 858, 870 (3d Cir. 1975). In this case, the regulation in question is unambiguous, and I must conclude that an interpretation that the regulation permits a preference on the basis of where the housing opening is located is plainly inconsistent with the regulation itself. Therefore, even if HUD officials

plainly stated that the HACC's preference system did not violate § 841.115, I would not be bound to adopt such an interpretation.[1]

#### (b) *Duration*

■ HACC's preference system is also flawed on the second ground advanced by Hess, the requirement of residence for six months or longer.

Even if that requirement related to the duration of residence within Chester County, rather than within the municipalities in which public housing is located, it would nonetheless be invalid. As before noted, § 841.115(c)(5) provides that "[n]o requirement or preference may be based upon . . . the length of time the applicant has resided in the jurisdiction." In *Yearsley v. Scranton Housing Authority*, 487 F.Supp. 784 (M.D.Pa.1979), the court relied upon § 841.-115 in voiding a Scranton Housing Authority regulation which gave a preference to applicants who were residents of the Authority's jurisdiction for longer than one year. As the court recognized, the language of the regulation is unambiguous: no preference may be given to an applicant on the basis of how long the applicant has resided within the jurisdiction of the housing authority. Defendants here have advanced no alternative construction of the regulation, and it is plainly binding upon HACC under both the Housing Act and the terms of its Annual Contributions Contract. Accordingly, HACC's preference for residents of six months or longer is invalid even if it were interpreted to require applicants to be residents of Chester County.

Since I have concluded that Hess is entitled to relief on the basis of the administrative regulations, there is no need to reach the constitutional issue she has raised with respect to HACC's preference system. *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

---

1. Counsel for plaintiff has submitted a letter from a HUD attorney in Washington which purportedly supports plaintiff's interpretation of the regulation. The parties had agreed to submit this matter to the court on stipulated facts. Counsel for defendants was completely unaware of plaintiff's correspondence with HUD officials in Washington until after the letter was submitted to the court. I agree with defendants that the letter is not properly a part of the record, and I have not considered it in deciding the case.

**800**

Judgment will be entered in favor of plaintiff and her class.

## CONCLUSIONS OF LAW

■ 1. The Court has jurisdiction under 28 U.S.C. § 1343(3) over plaintiffs' claims that HACC's preference system violates plaintiffs' constitutional rights to equal protection of the law. The court has pendent jurisdiction over plaintiffs' statutory claims. *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

2. Under the United States Housing Act of 1937, 42 U.S.C. § 1401 *et seq.,* as amended by the Housing and Community Development Act of 1974, 42 U.S.C. § 1437, *et seq.,* the Housing Authority of the County of Chester is bound to follow in administering its public housing programs valid regulations promulgated by the United States Department of Housing and Urban Development.

3. The policy of the Housing Authority of the County of Chester to grant preferences in filling vacancies in public housing to the residents of the municipality in which the housing is located and preferences based upon duration of residency is prohibited by HUD regulations at 24 C.F.R. § 841.115(c)(5).