2012 VT 82

## Bennington Housing Authority v. Danielle Lake

## Bennington Housing Authority v. Krista A. Saunders and Adam Rousseau

[59 A.3d 149]

Nos. 11-403 & 11-404

Present: **Dooley, Skoglund, Burgess and Robinson, JJ., and Crawford, Supr. J., Specially Assigned**

Opinion Filed October 5, 2012

K. *James Malady, III*, Bennington, for Plaintiff-Appellant.

*Maureen A. O'Reilly*, Vermont Legal Aid, Inc., Rutland, for Defendants-Appellees.

¶ 1. **Skoglund, J.** These consolidated cases concern a public housing authority and three of its tenants. Bennington Housing Authority (BHA) appeals two trial court decisions dismissing ejectment claims against tenants, and granting summary judgment to tenants on two counterclaims: (1) that BHA failed to properly advise tenants of their right to request a grievance hearing when it billed them for repairs and fines; and (2) that BHA's policy of fining tenants for open windows in the winter is prohibited under federal regulations. We affirm.

¶ 2. The facts in these two cases are strikingly similar. BHA is a public housing authority (PHA) under 42 U.S.C. § 1437 that owns and operates the Willowbrook apartment complex in Bennington, Vermont. In 2010, tenants Saunders and Rousseau were living in one Willowbrook apartment unit, while tenant Lake occupied another Willowbrook unit.

¶ 3. On June 14, 2010, BHA sent notice letters to tenants, informing them that their respective tenancies would end on July 16, 2010 due to failure to pay rent and various outstanding fines and fees. Both lease termination letters contained the same language: "Section 11, C of your lease . . . states in part, 'The notice of termination to tenant shall state . . . the tenant's right to examine management documents directly relevant to the termination or eviction, and of his/her right to request a hearing in

accordance with management's grievance procedure.'" Both letters also informed tenants that a private conference had been arranged with BHA's Executive Director, Deborah Reed, "at which time [tenants] will be given an opportunity to make such reply or explanation as [they] may wish."

¶ 4. Lake and Saunders each attended a meeting with Director Reed.[1] In the course of these meetings, both tenants expressed their concern over BHA's basis for eviction. Saunders told Reed she believed BHA had wrongly set her rent at too high a percentage of her combined family income. Reed then established a payment schedule for Saunders that Saunders said she could not satisfy. Lake told Reed her economic circumstances had changed in recent months, and that she was interested in working out a repayment plan for the money she owed. Both tenants stated that neither the letter nor their individual meetings with Reed made clear that they could request a grievance hearing or a hearing to challenge the charges to their accounts. Both tenants felt that they had no option but to pay BHA or be evicted.

¶ 5. Following these meetings, Director Reed sent a letter summarizing their discussion to Saunders, but evidently not to Lake. In this letter, Reed told Saunders: "If you stick to this agreement and make all the designated payments, we will stop the termination. If you do not make the agreed payments, we will continue with the termination of your lease and you will have to find another place to live." Reed did not make any mention of the grievance procedure or tenant's right to request a hearing.

---

[1] In its brief, BHA claims that Lake never attended the meeting with Director Reed but fails to support this assertion. We second the trial court's lamentations that "to attempt to identify [BHA]'s evidentiary basis for the disputed facts, the Court is required to flip back to [BHA]'s memorandum, and then follow any references to the exhibits appended to Ms. Lake's memorandum." Not only is this exercise, in the trial court's words, "laborious," it is to no avail. Despite attempting to follow BHA's paper trail, we cannot find anything that states Lake did not attend the meeting with Director Reed — we find only Lake's affidavit stating that she did. Thus, even giving BHA the benefit of the doubt that is accorded to the nonmovant in an appeal from summary judgment, without any supporting documentation for BHA's claim we must take Lake's account of events as true. *Boulton v CLD Consulting Eng'rs, Inc.*, 2003 VT 72, ¶ 5, 175 Vt. 413, 834 A.2d 37 ("It is not enough . . . for the nonmoving party to 'rest on allegations in the pleadings to rebut credible documentary evidence or affidavits.'") (quoting *Gore v Green Mountain Lakes, Inc.*, 140 Vt. 262, 266, 438 A.2d 373, 375 (1981)).

¶ 6. Neither tenant was able to make the payments demanded by BHA. As a result, in October 2010, BHA brought separate ejectment claims against each tenant. Tenants both filed answers to BHA's claims and asserted counterclaims against BHA for failing to adhere to federal regulations with regard to the bills sent to tenants and for BHA's policy of fining for open windows. Tenants moved for summary judgment on all claims, which BHA opposed. The trial court granted summary judgment and found for the tenants on all claims. The trial court held that: (1) BHA's termination notice was insufficient under federal law because it did not adequately inform tenants of the grievance procedure; (2) the bills sent to tenant for fines and repairs were insufficient because they did not provide notice of the grievance procedure; and (3) BHA's window-fines policy was impermissible under federal regulations. The trial court also ordered BHA to remove charges from tenants' accounts for window fines and various maintenance and repair costs. BHA appeals.

¶ 7. This Court applies a de novo standard of review to motions for summary judgment. *Madowitz v. Woods at Killington Owners' Ass'n*, 2010 VT 37, ¶ 9, 188 Vt. 197, 6 A.3d 1117. Summary judgment is appropriate only where "there is no genuine issue of material fact and . . . the movant is entitled to judgment as a matter of law." *Id.* (quotations omitted); see also V.R.C.P. 56(a).

¶ 8. In this case, BHA argues that there are two genuine issues of material fact: whether BHA informed tenants about their grievance rights in the termination letter, and similarly, whether BHA informed tenants of their grievance rights when billing for various fines and repair costs. BHA mischaracterizes these questions as issues of fact where they are actually issues of law.

■ ■ ¶ 9. A fact is defined as "[a]n actual or alleged event or circumstance, as distinguished from its legal effect, consequence, or interpretation." Black's Law Dictionary 628 (8th ed. 2004). Here, the question before the Court is not to determine the content of BHA's communications or whether such communications actually occurred; these would certainly be questions of fact. Instead, the Court must decide whether the undisputed content of BHA's communications to tenants meet the notice requirements of federal housing law. See, e.g., *In re S. Burlington-Shelburne Highway Project*, 174 Vt. 604, 605, 817 A.2d 49, 51 (2002) (mem.) ("Statutory interpretation is a question of law."); *Town of*

*Hinesburg v. Dunkling,* 167 Vt. 514, 521, 711 A.2d 1163, 1167 (1998) (addressing sufficiency of notice as a question of law in an appeal from summary judgment). Determining whether BHA adhered to federal regulations in its communication with tenants requires legal interpretation, not factual resolution, and thus, there are no genuine issues of material fact.

¶ 10. At issue, then, is whether tenants are entitled to judgment as a matter of law. First, however, we must address what source of law applies in this case. BHA appears unconvinced that federal regulations of PHAs govern in this case, and argues instead that case law interpreting constitutional due process notice require-ments should rule. BHA contends that the federal regulations promulgated by the Department of Housing Authority and Urban Development (HUD) regarding PHAs were meant to ensure that tenants were granted due process in their dealing with a housing authority. BHA further argues that because federal case law on general due process notice requirements set a lower standard than the PHA regulations, BHA need meet only this lower threshold. We disagree.

¶ 11. No party asserts that the federal regulations at issue in this case violate tenants' due process rights; therefore, we do not address any constitutional claims. *Brown v. Hous. Auth. of Milwaukee,* 471 F.2d 63, 64 (7th Cir. 1972) (stating that since the court found the housing authority procedures had violated federal regulations, it need not address whether the procedures also violated due process); *Thorpe v. Hous. Auth. of Durham,* 393 U.S. 268, 284 (1969) ("We do not sit . . . to decide abstract, hypothetical or contingent questions or to decide any constitutional question in advance of the necessity for its decision." (quotation and altera-tions omitted)). HUD has been granted broad rule-making author-ity. *Thorpe,* 393 U.S. at 277. As such, where HUD has promul-gated regulations of PHAs under the broad rule-making authority granted to it, those regulations are binding. *Hess v. Ward,* 497 F. Supp. 786, 798 (E.D. Pa. 1980). There is no reason why these regulations cannot hold PHAs to a higher standard than the constitution requires. "Agencies are free to grant additional pro-cedural rights in the exercise of their discretion." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 524 (1978). We therefore examine BHA's actions in this case against the applicable federal regulations.

## I.

¶ 12. All PHAs are required to adopt a grievance procedure affording tenants the right to a hearing where they might dispute any "action or failure to act" by the housing authority that "adversely affect[s] the individual tenant's rights, duties, welfare or status." 24 C.F.R. §§ 966.50, 966.52. HUD's intent in promulgating this regulation was to reduce the amount of litigation between tenants and housing authorities by offering a "decentralized, informal, and relatively non-adversarial administrative process." *Samuels v. Dist. of Columbia*, 770 F.2d 184, 189 (D.C. Cir. 1985). Recognizing that there are moments when conflict between a tenant and a housing authority is more likely than others, HUD has identified times when the housing authority must particularly inform tenants of their grievance rights. 24 C.F.R. § 966.4(e)(8)(ii). Specifically, § 966.4(e)(8)(ii) mandates that where a housing authority is taking "adverse action" against a tenant, "[t]he notice of proposed adverse action shall inform the tenant of the right to request such hearing." *Id.* Where such adverse action is a lease termination, § 966.4(*l*)(3)(ii) requires that the termination notice "shall also inform the tenant of the tenant's right to request a hearing in accordance with the PHA's grievance procedure." 24 C.F.R. § 966.4(*l*)(3)(ii).

¶ 13. BHA maintains that simply having a grievance procedure in place, referenced in a tenant's lease, and providing a copy with the lease is enough to fulfill its obligations under § 966.4. This argument completely ignores the plain language of the regulation, which requires a notice of lease termination to *"inform the tenant of the tenant's right to request a hearing." Id.* (emphasis added). Thus, although BHA has complied with federal regulations by having a grievance procedure and providing a copy of the grievance procedure to tenants with their lease, this fails, under the law, to inform tenants of the right to a hearing in the actual termination notice.

¶ 14. To this end, the wording of BHA's termination notice does not rise to the level of "inform[ing] the tenant of the right to request such hearing." 24 C.F.R. § 966.4(e)(8)(ii). Though BHA made reference to the grievance procedure in its letter to tenants, it did so in an indirect manner. BHA's letter refers tenants "to Section 11, C of [their] lease which states in part, 'The notice of termination to the tenant shall state . . . the tenant's right . . .

to request a hearing in accordance with management's grievance procedure.'" Using such wording, BHA never directly informed tenants of their right to request a hearing; rather, BHA informed them that the lease terms required BHA to inform them of their right to request a hearing. The construction of this statement in conjunction with unnecessarily confusing legal language subverts the informative purpose of 24 C.F.R. § 966.4(*l*)(3)(ii).

¶ 15. Why BHA did not simply and directly state that tenants have the right to a grievance hearing is somewhat mystifying. BHA could easily have made a direct assertion of tenants' rights under the grievance procedure, and yet it did not do so. Instead, BHA made a circuitous and confusing reference to the grievance procedure that failed to notify tenants of their right to a grievance hearing. "[A] tenant cannot be put in the position of having to speculate on the meaning and legal effect of the landlord's actions." *Andrus v. Dunbar*, 2005 VT 48, ¶ 13, 178 Vt. 554, 878 A.2d 245 (mem.). This principle leads us to conclude that BHA's statement to tenants in the termination notice letters failed to inform tenants of their grievance procedure rights as required by § 966.4(*l*)(3)(ii).

¶ 16. Even if we did not find BHA's actions insufficient under § 966.4(*l*)(3)(ii), we would still reject BHA's claim on the basis that the summary letter Director Reed sent violates 24 C.F.R. § 966.54. That regulation requires that any informal grievance discussion be followed by a summary letter that "shall *specify* the procedures by which a hearing under § 966.55 may be obtained if the complainant is not satisfied." 24 C.F.R. § 966.54 (emphasis added). BHA's summary letter to Saunders following their informal meeting neither mentioned the grievance procedure, nor specified the procedure for obtaining a grievance hearing. This is a clear violation of the federal regulation. Likewise, BHA's failure to send Lake any letter at all is an even more pronounced violation of this law. The fact that the regulations require summary letters to specify the procedure for obtaining a grievance hearing underscores the idea that tenants are intended to leave these meetings with an understanding of their options. Here, tenants felt they had no choice but to comply with BHA's demands. Thus, because BHA failed to clearly inform tenants of the grievance procedure in its notice of lease termination letters, and because the summary letter BHA sent (if at all) failed to

make any mention of the grievance procedure or specify how to request a grievance hearing, we affirm the trial court's dismissal of BHA's ejectment claims against tenants.

## II.

¶ 17. The second issue we address is whether BHA properly apprised tenants of their grievance rights in the bills sent to tenants for repairs and maintenance costs. Like a termination of lease notice, when a PHA charges a tenant for maintenance or repair costs, the bill is considered an "adverse action" under federal regulations. 24 C.F.R. § 966.4(e)(8)(i). As such, § 966.4(e)(8)(ii) requires that a tenant be afforded the opportunity for a grievance hearing concerning the adverse action and states, "The notice of proposed adverse action shall inform the tenant of the right to request such hearing." 24 C.F.R. § 966.4(e)(8)(ii).

■■ ■■ ¶ 18. Again, BHA ignores the plain language of the regulation and argues that its obligations under § 966.4 are satisfied by providing tenants with the grievance procedure when they sign their leases. This is simply not correct. Section 966.4 unmistakably requires that PHAs inform tenants of their right to a grievance hearing *in the notice of proposed adverse action. Id.* A tenant's lease is not a notice of proposed adverse action. A bill for maintenance and repair costs is. In this case, BHA's bills do not reference the grievance procedure or tenants' right to a grievance hearing to contest the billing charges. We agree with the trial court that this violates 24 C.F.R. § 966.4 and affirm the court's ruling on this claim.

## III.

¶ 19. We turn now to the final issue in this case: whether BHA's window-fine policy is permissible under the regulations governing PHAs. In response to rising heat costs, BHA instituted a policy of fining tenants who open their apartment windows when the outside temperature is below forty degrees Fahrenheit. BHA's employees patrol the apartment complex daily and report any open windows to management, who fine the tenant accordingly. In a given season, the first and second open-window violations are fined at fifty dollars, after which the fine goes up to seventy-five dollars. Tenants argue that this policy exceeds the boundaries of permissible charges that public housing authorities can impose on tenants under federal regulations. We agree.

¶ 20. Public housing authorities are permitted to impose charges beyond rent on tenants in two instances: (1) "for maintenance and repair beyond normal wear and tear"; and (2) "for consumption of excess utilities." 24 C.F.R. § 966.4(b)(2). BHA contends that the window fines are a charge for excess utility consumption. Surcharges for excess utilities provided by the housing authority are allowed for apartments that do not have individual checkmeters installed, but the housing authority "shall establish schedules of surcharges indicating additional dollar amounts residents will be required to pay by reason of estimated utility consumption attributable to resident-owned major appliances or to optional functions of PHA-furnished equipment." 24 C.F.R. § 965.506(b). Windows are certainly not resident-owned appliances; thus, in order for BHA's window-fines policy to be permissible as a surcharge for excess consumption of utilities, windows must be considered "PHA-furnished equipment."

¶ 21. Notwithstanding BHA's creative argument, windows are not PHA-furnished equipment. Section 965.505(b), which controls PHA utility allowance standards, gives several different examples of "equipment" found in an apartment: "major equipment," which includes a "heating furnace" or "hot water heater," "essential equipment" such as a "range and refrigerator," and "minor items of equipment" that include "toasters and radios." 24 C.F.R. § 965.506(b). All of these statutory examples of "equipment" are stand-alone electrical or gas-operated appliances. They are not existing structural components of an apartment, but rather elements that are brought in and installed within the existing construction of the apartment or apartment complex. Air conditioners, for example, are equipment under the regulations for which BHA rightfully can and does assess a charge against tenants for excess electricity use. A window is not a piece of "equipment" in the same way that an air conditioner is; nor do we think, based on the examples provided, that windows were intended to be included in this category.

¶ 22. Furthermore, the arbitrary cost assessed by BHA for open windows is enough to make BHA's policy impermissible under federal regulations. Section 965.506(b) states that where surcharges are assessed for excess utility consumption, they "shall be based on the cost to the PHA of the utility consumption estimated to be attributable to reasonable usage of such equip-

ment." 24 C.F.R. § 965.506(b). According to BHA, an open window in the winter can cost up to an additional $965 per apartment, per heating year. By our calculations, however, if a tenant had her window open every day of a thirty-day month, she could be fined $2200 that month alone — fifty dollars per day for the first two days, and seventy-five dollars per day for the next twenty-eight days. Thus, in a single month, BHA's fine rate is more than twice its estimated excess cost for an entire heating year. Section 965.506(b) allows only for surcharges *based on the cost* of the excess utility to the PHA. *Id.* The discrepancy between the maximum monthly window fine to tenants and the yearly cost of excess heat to BHA confirms the arbitrary nature of BHA's surcharge amount, which is not allowed based on the plain language of the federal regulations.[2] Therefore, BHA's policy of fining tenants for open windows in winter is impermissible under federal regulations, and we affirm the trial court's ruling on this claim.

¶ 23. For the reasons stated, we hold that BHA violated federal regulations for insufficient notice of the grievance procedure in both the termination of lease notices and the bills for maintenance and repair costs sent to tenants. We also agree with the trial court that BHA's window-fine policy is prohibited by federal regulations. BHA's ejectment claims are thus dismissed, and we affirm the trial court's grant of summary judgment on tenants' counterclaims.

*Affirmed.*

---

[2] BHA contends that HUD has seen and approved its window-fines policy because HUD approved BHA's Five-Year Plan, including the BHA *Resident's Handbook*, which contains the window-fines policy. However, in the letter approving BHA's plan, HUD's division director states, "This approval of the Plan does not constitute an endorsement of the strategies and policies outlined in the Plan . . . . BHA must comply with the rules, standards, and policies . . . provided in 24 C.F.R. Part 903 and other applicable regulations." We thus disregard BHA's argument as unsupported.